NOT FOR PUBLICATION                                      (Docket No. 33)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

```
_____
                               :
BRADLEY HALL,                  :
                               :
            Plaintiff,         :   Civil No. 03-5153 (RBK)
       v.                      :   OPINION
                               :
JOHNSON & JOHNSON, et al.,     :
                               :
            Defendants.        :
_____:
```

**KUGLER**, United States District Judge:

    This matter comes before the Court on motion by Defendants Johnson & Johnson, et al. ("Defendants"), for summary judgment of the claims of Plaintiff Bradley Hall ("Plaintiff"). For the reasons set forth below, Defendants' motion will be granted.

**I.   Background**

    Plaintiff filed the present Complaint on September 3, 2003, alleging that his knee implant device, a P.F.C. *Sigma*® Knee System Curved Tibial Insert manufactured by Defendants, was defective. In particular, he claims that the artificial knee deteriorated prematurely and failed well in advance of its alleged fifteen to twenty year life expectancy. (Pl. Compl. at 2.) Plaintiff's case is one of over fifty such suits alleging defects in Defendants' prosthetic knee devices; however, the vast

majority of these cases claim that Defendants employed a faulty procedure, "gamma-in-air sterilization," to sterilize their implants. In the present suit, it is undisputed that Plaintiff's prosthesis was sterilized by a different method, known as "gamma irradiation in vacuum foil packaging." Plaintiff nevertheless claims that the his implant failed prematurely "due to [the] . . . gamma-in-vacuum sterilization." (Opp'n at 11; Pl. Interrog., Filitti Cert., Oct. 21, 2005, Ex. K, ¶ 19.)

Plaintiff received the implant on November 20, 1997, during a total knee arthroplasty to treat degenerative arthritis in his left knee. His orthopedic surgeon, Dr. G.P. Boyum, told Plaintiff that the prosthetic had a life expectancy of fifteen to twenty years. Plaintiff required a follow-up surgery three days later to irrigate "extensive clotted blood" and address hemarthrosis and a fever. A December 8, 1997, evaluation by Dr. Boyum revealed that the components had good position and alignment. A subsequent evaluation by Dr. Boyum for swelling of Plaintiff's knee in December 1998, again revealed good position and alignment of the device.

Plaintiff was examined by Dr. David Fey on July 25, 2000, for complaints that his knee "collapses," and Dr. Paul Dworak on January 4, 2002, for complaints of knee pain. When Dr. Andrew Schmidt examined Plaintiff on September 4, 2002, Plaintiff reported that the knee had been feeling loose for approximately

the past year. Dr. Schmidt observed that the "patella appears to be tilted medially; however, flexion and extension of his patella seems to track fairly well," and "[t]here is a cluck when he actively extends the knee." (Def. Mot. at 4; Pl. Opp'n at 7.)

Dr. Schmidt performed revision surgery on the implant on September 11, 2002, noting that Plaintiff's "polyethylene liner was quite thin," and "it is felt that he likely developed wear of the polyethylene component but did not have loosening of the tibiofemoral components." (Def. Mot. at 5; Pl. Opp'n at 7.) In August 2003, Dr. Schmidt determined that Plaintiff "had worn out his polyethylene component." (Def. Mot. at 5.)

Plaintiff filed the present complaint on September 3, 2003, in the Superior Court of New Jersey, Camden County, and Defendants removed the case to this Court on the grounds of diversity jurisdiction. Defendants now move for summary judgment for lack of evidence that Plaintiff's prosthetic knee was defective.

**II.   Standard**

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could find for the

nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. Celotex, 477 U.S. at 330. The moving party may satisfy this burden by either (1) submitting affirmative evidence that negates an essential element of the nonmoving party's claim; or (2) demonstrating to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case. Id. at 331.

Once the moving party satisfies this initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Serbin, 96 F.3d at 69 n.2 (quoting Celotex, 477 U.S. at 322); Heffron v. Adamar of New Jersey, Inc., 270 F. Supp. 2d 562, 568-69 (D.N.J. 2003). "If the non-movant's evidence on any essential element of the claims asserted is merely 'colorable' or is 'not significantly

4

probative,' the court must enter summary judgment in favor of the moving party." Heffron, 270 F. Supp. 2d at 69 (citing Anderson, 477 U.S. at 249-50).

## III. Analysis

To establish a product liability claim, "a plaintiff must prove that the product was defective, that the defect existed when the product left the manufacturer's control, and that the defect proximately caused injuries to the plaintiff, a reasonably foreseeable or intended user." Myrlak v. Port Auth. of New York and New Jersey, 157 N.J. 84, 97 (N.J. 1999) (citations omitted). A product is considered defective "if it is not reasonably fit, suitable, or safe for the ordinary or foreseeable purpose for which it is sold." Id.

Defendants argue that the present case is indistinguishable from McMillan v. Johnson & Johnson, 04-cv-1180, in which this Court granted summary judgment to Defendants on August 8, 2005. As in the present case, McMillan had a prosthetic knee implant, sterilized by gamma irradiation in vacuum foil packaging. The Court granted summary judgment because McMillan did not present any evidence suggesting that the prosthesis "degraded more quickly than expected," or that the sterilization procedure employed "is associated with any injuries suffered by McMillan." (McMillan Op., filed Aug. 8, 2005, at 4-5.)

In the present case, Plaintiff contends that the premature

5

failure of his knee implant is sufficient evidence to permit a reasonable jury to find that the prosthetic was defective. In support of his claim, Plaintiff provided the Court with various medical articles, demonstrating that even with gamma irradiation in vacuum foil packaging, "free radicals continue to be present, post irradiation . . . which continue to degrade" the prosthetic device. (Opp'n at 11.) Plaintiff argues further that the allegedly premature failure of his knee itself requires Defendants to "come forward with some explanation of why the lifespan was only five years," when it was supposed to be fifteen to twenty years. (Pl. Opp'n at 12.) However, aside from Plaintiff's deposition testimony, attesting that his doctor told him his knee would last fifteen to twenty years, there is no evidence that the implant should have lasted longer than five years or that its deterioration was due to a defect rather than natural wear.

It is well established that "the mere occurrence of an accident is not sufficient to establish that the product was not fit for ordinary purposes"; rather, the plaintiff must provide some "proof, in a general sense and as understood by a layman, that 'something was wrong' with the product." Scanlon v. General Motors Corp., 65 N.J. 582, 591 (N.J. 1974) (citations omitted); Myrlak, 157 N.J. 84, 97-98. In some instances, such proof may take the form of circumstantial evidence "such as proof of proper

use, handling or operation of the product and the nature of the malfunction." Id. However, in other situations, "the testimony of an expert who has examined the product or who offers an opinion on the product's design" may be necessary to demonstrate to a lay jury that the product contains a defect. Id.

In particular, where the product at issue constitutes "a complex instrumentality," the plaintiff must provide expert testimony to "assist the fact finder" in ascertaining whether its failure was due to a defect and to exclude "other possible causes of the accident." Lauder v. Teaneck Volunteer Ambulance Corps, 368 N.J. Super. 320, 331-33 (App. Div. 2004). Courts have found sufficient complexity to mandate expert testimony in devices such as the locking apparatus on gurney legs, Id., and the emergency unlocking mechanism of a railroad car's sliding door, Rocco v. NJ Transit Rail Op., 330 N.J. Super. 320, 341 (App. Div. 2000).

Plaintiff argues that his claim is analogous to cases such as Jerista v. Murray, 185 N.J. 175 (N.J. 2005), and Scanlon, 65 N.J. at 593, which stand for the proposition that expert testimony is unnecessary where "the normal course of human experience" permits the juror to infer that "something was wrong" with the product. Myrlak, 157 N.J. at 99. Thus, when an automobile malfunctions after only 4,000 miles of use, as in Scanlon, 65 N.J. at 593, most lay jurors can infer that the product malfunctioned due to a defect, because common experience

7

informs us that the lifespan of a car is far in excess of 4,000 miles. Similarly, where an automatic store door closes on a patron, common sense and experience suggest that the door must have been defective.

No such common experience exists with regard to prosthetic knees. Without expert testimony, the average lay juror has no grounds to know if an implant should last two, five, or twenty years, and the jury can do little more than speculate as to the cause of the prosthetic's wear. Neither the evidence before the Court, nor common experience, would permit a juror to conclude that there was "something wrong" with Plaintiff's knee implant simply because it required replacement after five years.

The "credible medical literature" Plaintiff provided to the Court is an insufficient substitution for the testimony of an expert. See Morlino v. Medical Ctr. of Ocean County, 152 N.J. 563, 580-81 (N.J.,1998) (holding that a treatise is not a substitute for expert testimony); Tyndall v. Zaboski, 306 N.J. Super. 423, 425 (App. Div. 1997) (same). In any event, this literature merely establishes that the sterilization method employed by Defendants is imperfect, not that it is defective.

Moreover, all evidence in the record indicates that the prosthetic was not defective. No medical records, including those of Dr. Schmidt, suggest that the prosthesis' wear was due to the its sterilization, and Plaintiff acknowledged that he could not

8

recall if any doctor had ever told him that there was a defect with his prosthesis. (Hall Dep. 85:4-6, Filitti Cert., Oct. 21, 2005, Ex. H.) Defendants argue that the implant's deterioration may have resulted from maltracking of the prosthetic components, though Plaintiff disputes this explanation on the grounds that most of Plaintiff's medical examinations found the implant to be tracking well.[1] In any event, the absence of any evidence that the wear of Plaintiff's prosthetic constituted a defect obviates the need for Defendants to explain its deterioration. See Celotex, 477 U.S. at 330.

Accordingly, because there is no evidence that Plaintiff's artificial knee deteriorated prematurely or was otherwise defective, Defendants are entitled to summary judgment.

The accompanying Order shall issue today.

Dated: April 25, 2006      S/Robert B. Kugler
                           ROBERT B. KUGLER
                           United States District Judge

---

[1] Specifically, Defendants note that on September 24, 2003, Dr. Schmidt observed that Plaintiff "has a very complicated problem. My feeling is that his symptoms are related to his mal tracking patella," (Wayzata Orthopedics Records, Filitti Cert., filed Oct. 21, 2005, Ex. G., at 2), and Plaintiff himself acknowledged that his left kneecap is "malaligned." (Pl. Dep. 133:9-25, Filitti Cert., filed Oct. 21, 2005, Ex. H.)